**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JUVENILE 'V. R.'** **NOW 18 YEARS OF AGE,** | |
| *Plaintiff,* | |
| **vs.** | NO. 22-CV-01499 |
| **MUNICIPALITY OF BETHEL PARK POLICE DEPARTMENT** **5100 W. Library Avenue** **Bethel Park, PA 15102** | CIVIL ACTION JURY TRIAL DEMANDED |
| **TIMOTHY O'CONNOR, Chief, Municipality of Bethel Park Police Department, individually and in his official capacity** | |
| **JOELLE DIXON, Detective, Municipality of Bethel Park Police Department, individually and in her official capacity,** | |
| *Defendants.* | |

---

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**INTRODUCTION**

On October 25, 2022, Plaintiff filed the above-captioned Complaint pursuant to 42 U.S.C. § 1983 to redress violations of his right to privacy under the Fourth and Fourteenth Amendments to the U.S. Constitution. Plaintiff's Complaint incorporates an additional state law claim of false light-invasion of privacy.

On January 18, 2023, pursuant to Fed. R. Civ. P. 12(b)(6), Defendants filed a motion to dismiss all counts of Plaintiff's Complaint for failure to state a claim upon which relief can be

granted.  With the Court's leave, the parties stipulated to extend the due date for Plaintiff's

Response to the motion to dismiss and supporting brief until March 1, 2023.

## **FACTUAL AND PROCEDURAL BACKGROUND**

Defendants' statement of this case's factual and procedural background is incorrect in

two instances.

First, Defendants assert that Count 3 of Plaintiff's Complaint is "wholly duplicative" of

Counts 1 and 2 (Defendants' Brief at p. 2.)  In fact Count 3 is easily distinguishable from Counts

1 and 2.  While reasserting that Plaintiff's arrest violated his constitutional rights, Count 3 further

asserts separate claims that (a) Defendant Dixon violated state law and Plaintiff's constitutional

right of personal privacy by contacting University of Pittsburgh officials to inform them of

Plaintiff's arrest and the nature of the charges against him; and (b) that Defendants O'Connor

and the Bethel Park Police failed to properly train and supervise its employees in state and

federal laws governing the arrests of juveniles, and that the violation of Plaintiff's constitutional

rights were a direct result of this failure.  These claims do not appear in any other count.

Second, Defendants assert that "[Plaintiff] claims the alleged violation of privacy under

state law creates a federal Constitutional deprivation."  (Brief at p. 2).  Plaintiff does not claim

that the violation of his privacy arises only under state law.  Plaintiff claims that (a) in disclosing

confidential juvenile records of the most intimate nature, Defendants violated his right to

personal privacy, and that (b) in arresting him in his domicile without probable cause,

Defendants violated his right to be free of the unreasonable seizure of his person.  Plaintiff

asserts that both rights violate not only state law, but also violate rights under the Fourth and

Fourteenth Amendments to the U.S. Constitution.

**STANDARD OF REVIEW**

Defendants' statement of the standard of review includes several well-known excerpts from *Bell Atlantic v. Twombly,* 127 S.Ct. 1955 (2007), as further affirmed in *Ashcroft v. Iqbal,* 129 S. Ct. 1937 (2009). Plaintiff agrees that these cases state the standard of review when a district court evaluates the sufficiency of a claim pursuant to a 12(b)(6) motion to dismiss. Justice Souter's words from *Twombly* fairly summarizes the two companion cases: the plaintiff's complaint must more than amply "nudg[e] his claim across the line from conceivable" to plausible," *Twombly* at 1960, "thereby raising a right to relief above the speculative level." *Id.* at 1965. The Court acknowledged the possible delicacy of this task in noting that it is permissible for the trial court to "draw on its judicial experience and common sense." *Iqbal* at 1940.

**ARGUMENT**

## I.   Plaintiff Does Not Attack His State Court Conviction

Defendants contend that "Plaintiff's Complaint is a collateral attack on his state court adjudication," and cites several cases for the proposition that this is impermissible.

Plaintiff is utterly baffled by Defendants' extraordinary and totally unsupported supposition that in this § 1983 action Plaintiff is in any way trying to attack his conviction. Nothing in the Complaint supports this conclusion. Plaintiff's Complaint is comprised solely of constitutional claims in Counts 1, 2 and 3, and a state law claim that his right to privacy was violated when three uniformed officers publicly arrested him in his dormitory, thereby placing him in the false light of a criminal.

## II.    CONSTITUTIONAL CLAIMS – COUNTS 1, 2 AND 3

### A. Counts 1 through 3 correctly state that Plaintiff's right to privacy is a federally protected right.

The gravamen of Plaintiff's argument is that by disclosing his juvenile records and arresting him without probable cause, Defendants violated his right to personal privacy as guaranteed by the U.S. Constitution.  In his Complaint Plaintiff clearly articulates well-founded and fact-based claims upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6).

**The Fourth Amendment.**  "The right of the people to be secure in their persons… against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation..."  U.S. Const. amend. IV.

**The Due Process Clause.**  "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law…" U.S. Const. amend. XIV, § 2.

### 1.  The constitutional right to privacy.

The constitutional right to privacy "encompasses two distinct interests. "'One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions.'"  *Nunez v. Pachman,* 578 F.3d 228, 232 n. 7 (3d Cir. 2009) (quoting *Whalen v. Roe,* 97 S.Ct. 869, 877 (1977).

 Plaintiff's claim in Count 1 implicates the former interest: the "right not to have intimate facts concerning one's life disclosed without one's consent." *Doe v. Luzerne County,* 660 F.3d 169, 175 (3d Cir. 2011) (citations omitted).

Counts 2 and 3 are based on another fundamental aspect of privacy that stems from the Fourth Amendment and the Due Process Clause of the Fourteenth Amendment: the right to be free

of intrusive government searches and seizures conducted without a finding of probable cause by a neutral judicial officer.

A right to privacy has a long history in Supreme Court jurisprudence.  The right has its roots in a seminal law review article in 1890 by Louis Brandeis, wherein he famously invoked "the right to be left alone" - a notion that lies at the heart of every American's fundamental concept of personal privacy. Warren & Brandeis, *The Right to Privacy*, 4 Harv. L.Rev. 193 (1890).  The "right to be left alone" is often cited in Supreme Court jurisprudence, notably in *Katz v. United States*, 88 S.Ct. 507, 510-11 (1967), a landmark ruling that established personal privacy as being within the contours of the Fourth Amendment.

**2.  *O'Neill v. Kerrigan* is based on a different legal principle from the instant matter, and thus is inapposite.**

In their brief, Defendants extensively cite *O'Neill v. Kerrigan*, 2013 WL 654409 (E.D. Pa. 2013).

*O'Neill* has a superficial appeal because at first glance its facts and legal claims appear similar to those in the present matter.  Defendants' reliance on *O'Neill* is understandable, but misplaced.

As in this matter, in *O'Neill* police arrested a juvenile on a school campus – in O'Neill's case, his high school.  A uniformed officer informed school officials that the juvenile was subject to arrest for an alleged drug offense.  Accompanied by the principal, the officer interrupted a class in session to remove the student from the classroom.  O'Neill remained in the principal's office with the arresting officers and principal until a parent arrived.  Officers then handcuffed O'Neill and, again in plain view of students and school personnel, escorted him out of the building to a marked police car, and drove away.  *Id*. at 1-2.

In his suit against the school district, the arresting officer, and chief of police, O'Neill alleged that being arrested on school grounds in such a conspicuous manner effectively disclosed his juvenile records, and thus violated his right to privacy under the Fourth, Ninth and Fourteenth Amendments.

While the circumstances of *O'Neill* and the instant matter appear uncannily similar, the legal framework of *O'Neill* and the legal framework of this case are vastly different. In *O'Neill*, the plaintiff was arrested pursuant to a valid warrant. In the instant case, officers had no warrant or any other showing of probable cause to arrest V. R. As argued below, for this reason *O'Neill* offers no substantive guidance in resolving the instant matter.

### 3. Plaintiff had a reasonable expectation of privacy in his juvenile records.

The *O'Neill* court noted that in determining whether information is entitled to privacy protection, the Third Circuit Court of Appeals has traditionally "looked at whether [the information] is within an individual's reasonable expectations of confidentiality." *Id*. at 8.

It has been decades since the U.S. Supreme Court held that juveniles are entitled to constitutional rights. *In re Gault*, 87 S.Ct. 1428, 1436 (1967) ("[N]either the Fourteenth Amendment nor the Bill of Rights is for adults alone." *Bellotti v. Baird*, 99 S.Ct. 3035, 3043 (1979) ("A child, merely on account of his minority, is not beyond the protection of the Constitution.").

Both Pennsylvania and federal law strictly prohibit the disclosure of juvenile records to unauthorized persons. Like adults, juveniles have a constitutional right to privacy, and a right to be free from unreasonable searches and seizures. *In the Interest of A.D.*, 844 A2d 20, 25 (Pa. Super. Ct. 2004), citing *New Jersey v. T.L.O.*, 105 S.Ct. 733, 735 (1985).

Among the state laws pertaining to a juvenile's interest in the privacy of his records are 42 Pa C.S. § 6308(a) (juvenile records are to be kept confidential from the general public), Pa. R.J.C.P. 160(C) (unauthorized disclosure of juvenile records "may result in a finding of contempt of court,") and Pa. R.J.C.P. 163(A) (a juvenile's school may be notified of the juvenile's adjudication only by a probation officer, not by a police officer).

Specifically, it is understandable that Plaintiff would reasonably expect that law enforcement officers acting under color of state law would be familiar with laws governing their conduct.  Thus V. R. had a reasonable expectation that Defendant Dixon, a trained police officer, would be aware that to expose his juvenile record by arresting him in a public manner, as well as gratuitously exposing his status to university officials, would be in express violation of the unambiguous wording of 42 Pa. C.S. § 6803(a), Pa. R.J.C.P. 160(C) and other state court rules regarding the confidentiality of juvenile records and procedures for the arrest of a juvenile.

The gravity of society's interest in protecting the privacy of juvenile records is further reflected in the Federal Juvenile Code at 42 U.S.C. § 5038(a) ("the records shall be safeguarded from disclosure to unauthorized persons…")

Were he aware of the case, Plaintiff's expectation of privacy would be further heightened by the Third Circuit's ruling that "the more intimate or personal the information, the more justified is the expectation that it will not be subject to public scrutiny." *Malleus v. George,* 641 F.3d 560, 564 (2011), quoting *Fraternal Order of Police v. City of Phila.,* 812 F.2d 105, 112–13 (3d Cir.1987).  It is hard to imagine an area more "intimate" and sensitive to disclosure than an allegation of sexual misconduct.  This is the precise category of offense Plaintiff was charged with and was part of the intimate information that Defendant Dixon shared with university officials when she unlawfully notified them of Plaintiff's arrest.

**4. Pennsylvania laws are in full harmony with notions of individual privacy that underlie the Fourth Amendment and Due Process Clause.**

The legislative intent behind the Pennsylvania Juvenile Act (42 Pa C.S. 6301 *et seq.*) is explicitly set out in the introductory sections of the Pa. Rules of Juvenile Procedure.  Pa. R.J.C.P 101(c) states that the court's rules "shall be *interpreted and construed to effectuate the purpose stated in the Juvenile Act*, 42 Pa. C.S. § 6301" (emphasis added).  § 6308(a) of the statute is based on the premise that juveniles have a right to privacy in their records, giving rise to a reasonable expectation that those records will be disclosed only to persons specifically authorized by the statute.

In short, there is little daylight between the principles underlying the Fourth Amendment, 42 U.S.C. § 5038 and the legislative intent of Pennsylvania laws governing the confidentiality of juvenile records.[1]  The Fourth Amendment and aforementioned state laws spring from the same source – the right, long recognized in federal constitutional law, "not to have intimate facts concerning one's life disclosed without one's consent."  *Doe v. Luzerne County, supra* at 175.

**5. The constitutional question in *O'Neill*, and how the court resolved it.**

The key constitutional question in *O'Neill* was whether a constructive disclosure of O'Neill's juvenile records, as brought about by his very public arrest, violated his right to privacy as guaranteed by the Fourth Amendment and the Due Process Clause of the Fourteenth

---

[1] In their brief, Defendants cite numerous cases for the proposition that criminal records are generally not protected from disclosure to the public.  (Brief at p. 14).  With one unremarkable exception, all of these cases involve adults, and thus provide no meaningful analogs to juvenile records.  As noted above, both Pennsylvania and federal law distinguish between criminal and juvenile criminal records, holding that the latter are to be kept strictly confidential.  *See O'Neill* at 8 ("There is reason to distinguish juvenile arrest records from adult criminal records. Unlike adult records, juvenile records are widely protected from disclosure under federal and state law, including the provisions of Pennsylvania's Juvenile Act and Juvenile Court rules.").

Amendment.  The court analyzed this question at great length, but ultimately avoided answering it.  Instead, the court summarily concluded the opinion with a brief qualified immunity analysis.

The court's qualified immunity analysis began with the fact that to date no Third Circuit opinion had held that juvenile records are subject to federal constitutional protection.  There being no constitutionally protected right to begin with, the court reasoned, it followed that disclosure of a juvenile record did not implicate one prong of the U.S. Supreme Court's bright-line test for qualified immunity (*see Saucier v. Katz*, 121 S.Ct. 2151 (2001): that is, whether the officers violated a right that was "clearly established" at the time of the conduct.  Despite the court's professed sympathy for O'Neill's right-to-privacy argument, it held that the officers were entitled to qualified immunity.  Since qualified immunity excused the defendants from all liability, the case was effectively over, and the court granted defendants' motion to dismiss.

As noted above, in resolving the case the *O'Neill* court relied squarely on the fact that the Third Circuit had not held that the unauthorized disclosure of a juvenile's court records was a violation of federal constitutional law.  But nothing in Third Circuit or U.S. Supreme Court jurisprudence has ever expressly prohibited such a finding.  In fact, the Supreme Court has recognized that states are uniquely situated to regulate rights and privileges in juvenile law.  *See, generally*, *McKeiver v. PA*., 91 S.Ct. 1976 (states have considerable latitude in determining appliable criminal procedures in juvenile adjudications.)

### 6.  Two federal courts have found a Fourth Amendment violation in the unauthorized disclosure of juvenile records.

A juvenile's reasonable expectation of privacy in his records has persuaded more than one federal court to recognize that disclosure of juvenile records rises to a constitutional violation.  See *Soucie v. County of Monroe*, 736 F.Supp. 33 (W.D.N.Y. 1990).  Basing its finding on an expectation of privacy analysis, *Soucie* found that state laws regarding the strict confidentiality of

juvenile records justified a reasonable expectation of privacy under the Fourth Amendment and Due Process Clause of the Fourteenth Amendment.  *Id.* at 35.

A similar result was reached in *Wagner v. Hyra*, 58 F.Supp.3d 613 (N.D.N.Y. 2021).  In *Wagner* an adult plaintiff brought a § 1983 action for the malicious release of his juvenile arrest record, an action the court described as "in clear violation of a state law written specifically to prevent that kind of disclosure."  *Id*. at 640.

The *Wagner* court, like the *O'Neill* court, noted that the federal court of appeals for its jurisdiction (the Second Circuit) had never found a federal constitutional violation in the disclosure of confidential records (e.g., medical and juvenile records).  The *Wagner* court broke ground in holding that under the Fourth Amendment and the Due Process Clause of the Fourteenth Amendment, "Plaintiff has plausibly alleged a limited privacy interest of constitutional magnitude in the sensitive juvenile arrest record."  *Id.* at 642.  Consequently, the court found that defendants were not entitled to qualified immunity.

### 7. The constitutional issue in *O'Neill*, where the plaintiff was arrested pursuant to an arrest warrant, is far different from the constitutional issues in the instant case.

The fundamental difference that renders *O'Neill* inapposite to the present case is that O'Neill was arrested pursuant to a valid search warrant.  In the instant matter Plaintiff was not arrested pursuant to a warrant or any independent finding of probable cause.

By contrast, the *O'Neill* court consistently emphasizes – it runs through the opinion like a steady drumbeat – that O'Neill was arrested pursuant to a valid warrant supported by probable cause.  In the court's view the fact that O'Neill was arrested pursuant to a warrant went a long way toward excusing conduct – arresting a student on a school campus and in plain view of school personnel and his peers - that the court otherwise found troubling.  It has been held that a

search or seizure effectuated pursuant to a valid warrant may excuse conduct that otherwise might be excessively intrusive. *Whren v. United States*, 517 U.S. 806, 817 (1996). In short, if the plaintiff had not been arrested pursuant to a valid arrest warrant, the outcome of *O'Neill v. Kerrigan* could well have been very different.

**B.** **It is black-letter law, in both federal and Pennsylvania courts, that absent exigent circumstances, an arrest for an offense not committed in the officer's presence requires a warrant supported by a finding of probable cause made by a neutral judicial officer.**

**1.** **An arrest without a warrant supported by probable cause is presumptively unreasonable.**

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons…against unreasonable seizures." U.S. Const. Amend. IV.

An arrest warrant supported by probable cause is presumptively reasonable under the Fourth Amendment because "a warrant may issue only upon a showing or probable cause." *Fabrikant v. French*, 691 F.3d 193, 214 (2d Cir. 2012), quoting *Payton v. New York*, 100 S.Ct. 1371, 1380 (1980).

Conversely, the U.S. Supreme Court has recognized, as a 'basic principle of Fourth Amendment law,' that searches and seizures inside a home without a warrant are presumptively unreasonable.'" *Id.,* citing *Coolidge v. New Hampshire*, 91 S.Ct. 2022, 2026). *See also* **Welsh v. Wisconsin**, 100 S.Ct. 2091, 2097 (1984)[2] Federal district courts in Pennsylvania have affirmed this basic Fourth Amendment right in numerous cases, among them *Wagner v. Holtzapple*, 101

---

[2] Courts draw no meaningful distinction between their treatment of the two interests protected by the Fourth Amendment. "The simple language of the Amendment applies equally to seizures of persons and to seizures of property." *Payton* at 585.

F.Supp.3d 462 (M.D.P.A. 2015) ("The right to be secure in one's own home against unreasonable searches and seizures is a clearly established right.")  *Id.* at 479.

The U.S. Supreme Court has emphasized that exceptions to the warrant requirement are "few in number and carefully delineated."  *United States v. United States District Court*, 92 S.Ct. 2125, 2137 (1972).  Police bear a "heavy burden" when attempting to justify a warrantless search."  *Id.* at 2140   (Douglas, J., concurring).

**2. Pennsylvania laws concerning arrest, in particular the arrest of a juvenile, are consistent in spirit with the Fourth Amendment's prohibition of unreasonable searches and seizures.**

In general state law controls the legality of a warrantless arrest, provided such laws conform to the Fourth Amendment's command that any arrest must be supported by probable cause.  *United States v. Di Re*, 68 S.Ct., 222, 226 (1968).

It is noted above that Pennsylvania laws and rules of juvenile procedure are consistent with the privacy interests expressed in the Fourth and Fourteenth Amendments.  The same is true of state laws regarding juvenile arrests.  Pennsylvania courts and the Third Circuit have consistently held that absent exigent circumstances, a warrantless search is per se unreasonable. *Commonwealth v. Romero*, 646 Pa. 47 (exigent circumstances did not justify a warrantless entry into defendant's home); *Commonwealth v. Edgin*, 273 A.3d 573, 580 (Pa. Super. Ct. 2022) (held that exigent circumstances do not excuse a warrantless entry).  *See also Ray v. Township of Warren*, 626 F.3d 170, 174, (3d Cir. 2010), citing *Illinois v. Rodriguez*, 110 S.Ct. 2793 (1990).

In short, the animating spirit of the Fourth Amendment and the legislative intent of Pennsylvania laws share the same premise – that the government is constitutionally forbidden from intruding on the privacy of one's domicile, possessions or person except with a warrant supported by probable cause.

**3. Exigent circumstances may justify a warrantless arrest.**

Courts have long recognized two major exceptions to the rule that a warrantless arrest is presumptively a violation of the Fourth Amendment.

One exception is that a warrantless arrest is permissible when the offense occurs in the presence of the arresting officer. *Atwater v. City of Lago Vista*, 121 S.Ct. 1537, 1556 (2001). The second is the "exigent circumstances" exception. This exception may turn upon "a 'reasonableness determination' [that involves] a balancing of all relevant factors" between the person's Fourth Amendment protections and the needs of law enforcement. However, "[w]ith rare exceptions… the result of that balancing is not in doubt where the search or seizure is based upon probable cause." *Whren, supra,* at 817 (1996). That is, a search or seizure executed pursuant to a valid warrant may excuse conduct that otherwise might be excessively intrusive.

The exigent circumstances exception applies principally when it is impracticable for an officer to obtain a warrant before conducting a search or seizure. *Lange v. California*, 141 S.Ct. 2011, 2016 (2011) ("[A]n officer may make a warrantless entry when 'the exigencies of the situation' create a compelling law enforcement need." "[A] search or seizure carried out on a suspect's premises without a warrant is per se unreasonable, unless the police can show ... the presence of 'exigent circumstances'"). *Payton at* 1380. Absent exigent circumstances, "that threshold [of a person's domicile] may not reasonably be crossed without a warrant." *Id*. *Cf. U.S. v. Paige*, 493 F.Supp.2d 641, 648 (W.D.N.Y. 2007) (court denies officers' claim of exigent circumstances for warrantless arrest in defendant's apartment); *New Hampshire v. Robinson*, 158 N.H. 792, 803, (2009) (exigent circumstances did not justify warrantless entry).

**4. Plaintiff's warrantless arrest cannot be excused by exigent circumstances.**

Police encountered no exigent circumstances when they arrested V. R.  The arrest took place in daylight on an ordinary autumn afternoon at the University of Pittsburgh.  Plaintiff was in his dormitory room speaking with a friend when university police officers, acting at the behest of Defendant Dixon and her superior Defendant O'Connor, knocked on his door and asked if he were V. R.  Plaintiff acknowledged that he was V. R.  He did not resist arrest.  He was not committing a crime or on the verge of committing one.  He did not pose a flight risk.  The offense underlying the charges pending against Plaintiff was not so grave that he posed an immediate risk to other persons or was likely to commit other crimes (see *Welsh v. Wisconsin*, *supra* at 2098.

In the instant case, it is abundantly clear in Plaintiff's Complaint that when he was arrested and paraded down the corridors of his dormitory in handcuffs, the officers had been given no warrant for his arrest, or anything remotely resembling a warrant.  Defendant Dixon had not provided Pitt officers with any written authority from a neutral judicial officer who had found probable cause to arrest V. R.  In fact, between the time of his arrest and his arrival at the university police's Oakland Station, the Pitt officers showed him no paper of any kind.  Nor did he see anything resembling a warrant when Pitt officers released Plaintiff into the custody of Defendant Dixon of the Bethel Park Police Department.  V. R. saw no paper or notice of arrest prior to being transported, in handcuffs, by Defendant Dixon and fellow officers to Cove Prep Detention Facility in Torrance, PA, a drive of almost two hours.  Nor were V. R.'s parents at any time given anything resembling an affidavit of probable cause to arrest their son, including when the hearing officer discharged him to their care on Monday, October 25.

In sum, both federal and Pennsylvania courts uniformly hold that, absent exigent circumstances, a warrantless arrest in a person's home is per se unreasonable.  *Commonwealth v. Romero*, *supra*.

**5.   An unsigned letter from a court officer does not suffice as an arrest warrant.**

The only notice remotely pertaining to Plaintiff's arrest was a single piece of paper, addressed to Plaintiff's parents and sent by U.S. Mail, that they found in their mailbox upon arriving home from Cove Prep on Monday, October 25, 2021.  The paper, attached here as Exhibit A, was on the letterhead of Administrative Judge Kim D. Eaton and Chief Administrator Russell Carlino, 5th Judicial District, Family division – Juvenile Section.  Dated October 21, 2021, the paper listed the offenses with which Plaintiff could be charged.  It stated, "An Intake Officer will contact you to discuss this matter further" – nothing more.  The paper was not signed by any person.  It did not mention the words "arrest" or "warrant" or "probable cause."  To this day Plaintiff has not been presented with any paper demonstrating that the Bethel Police Department had an arrest warrant or even sought one.

**6.   A dormitory room is the equivalent of one's domicile.**

Federal and state courts uniformly hold that the Fourth Amendment's prohibition against warrantless searches and seizures is at its zenith when applied to a person's domicile.

"[T]he overriding respect for the sanctity of the home…has been embedded in our traditions since the origins of the Republic." *Oliver v. United States*, 104 S.Ct. 1735, 1741, quoting *Payton* at 1387.  At the "very core of [the] Fourth Amendment stands [the] right of [a] man to retreat into his own home and there be free from unreasonable government intrusion, and this is true as against seizures of property and seizures of person." *Payton* at 1382.

Pennsylvania courts have held that a dormitory room is the equivalent of a student's domicile – a home-away-from home where the student is entitled to privacy and freedom from unlawful intrusion.  "An individual student's right to privacy is not abrogated because the student has chosen to live in a university dormitory." *American Future Systems, Inc. v. Penn State Univ.*,

688 F.2d 907, 915 (3d Cir. 1982).  See also *Brush v. Penn State*, 489 Pa. 243, 250 (1980) (living

areas of a residence hall are private in nature); *Piazzola v. Watkins*, 442 F.2d 284, 289-90 (5th Cir.

1971) ("We… conclude that a student who occupies a college dormitory room enjoys the

protection of the Fourth Amendment."  Nor is a student obliged to permit an officer to enter his

dorm room without a valid warrant.  As the *Piazzola* court stated:

> It offends reason and logic to suppose that a student will consent to an entry into
> his room designed to establish grounds upon which to arrest him.  Certainly, there
> can be no rational claim that a student will self-consciously waive his Constitutional
> right to a lawful search and seizure.

*Id.*.at 287.  See also D & C2d 186, 200 (Allegheny County CCP, 1943) (room in YMCA

establishment provided a "home away from home"); *Hall v. Millersville Univ.*, 400 F.Supp. 252,

279 (E.D. Pa. 2018) (the court notes that defendant and victim walked back to the victim's "home,"

which was her dormitory room.)

### 7. Defendants, having made no effort to obtain a warrant, had Plaintiff arrested in his home without a warrant supported by probable cause.

In their Motion to Dismiss and brief, Defendants avoid discussion of the major point in

Counts 2 and 3 of Plaintiff's Complaint: namely, that the warrantless arrest of Plaintiff violated

Pennsylvania law, specific provisions of the Pa. Rules of Juvenile Court Procedure, and – most

significantly – the federal Constitution.

As Defendants point out (Brief at p. 5), it is appropriate for parties to attach exhibits to

pleadings that will aid the court when ruling on motions.  A copy of the arrest warrant, properly

redacted to protect the confidentiality of Plaintiff's juvenile records, could have been attached here

for the court's review.

The arrest warrant is not the only document Defendants could have provided to show they

followed laws governing the arrest of a juvenile.

Also missing are: (1) Defendant Dixon's written allegation and (2) her affidavit showing probable cause, both required under Pa. R.J.C.P. 210(A); (3) certification that the written allegation was submitted to the probation office and to the attorney for the Commonwealth for approval pursuant to Pa. R.J.C.P. 233(A)(1) and (C)(1);  (4) notice to the juvenile's guardian of the pending arrest and the reason for the arrest as required by Pa. R.J.C.P. 220(1)(a) and (b); and (5) the various written communications between the issuing authority, probation office and juvenile court as required by Pa. R.J.C.P. 210(D) through (F).

Instead, Defendants attached to their brief the "AFFIDAVIT OF JOELLE DIXON."  The affidavit was not signed prior to Plaintiff's arrest, but on January 18, 2023, the very day Defendants filed their 12(b)(6) pleadings in the instant matter, and 15 months after Plaintiff's arrest.

In her affidavit, Defendant Dixon states that a "Juvenile Allegation" is "the juvenile court equivalent of a criminal complaint supported by probable cause."[3]  Clearly, a written allegation without an accompanying signed affidavit – that is, a paper with no affidavit of probable cause for an independent judicial officer to review - cannot not establish probable cause.  Otherwise A could accuse B of a crime, an officer would write up a written allegation based on B's statement, and police would then arrest B merely on A's allegation.

Detective Dixon's characterization of a "Juvenile Allegation" also flatly contradicts Pa. R.J.C.P 210, which states:

> **RULE 210.A.  Application.** An application for an arrest warrant shall be made by submitting a written allegation supported by a probable cause affidavit with the president judge or any issuing authority designated by the president judge of each

---

[3] A "WRITTEN ALLEGATION" form for juvenile cases is available on the www.pacourts.us website.  The form has a small space for the juvenile's name and case number, etc., and a large space for an "AFFIDAVIT OF PROBABLE CAUSE."  Defendants have provided no evidence that such a form was submitted to an issuing authority in connection with Plaintiff's arrest.

17

judicial district. The president judge shall ensure twenty-four-hour availability of a designated issuing authority.[4]

Defendants cannot claim there were any practical impediments preventing Defendant Dixon from filing an affidavit in support of an arrest warrant. She had access to attorneys or experienced officers to help her prepare an affidavit stating probable cause. By statute, an "issuing authority" to review requests for warrants was available 24 hours a day.

The fact that Defendant Dixon may have thought she had probable cause for an arrest, or the fact that after his arrest Plaintiff was adjudicated delinquent, cannot excuse her failure to obtain an arrest warrant:

> It is not enough, absent exigent circumstances, that a policeman believes the facts he has are probable cause for a search warrant. The people of this state and nation are constitutionally entitled to an independent judicial determination of probable cause… Moreover, that determination must be made before and not after the search.

*Commonwealth v. Chandler,* 505 Pa. 113, 117 (1984), citing *Johnson v. United States,* 68 S.Ct. 367, 369 (1948).

Defendant Dixon ignored the Fourth Amendment's directive to obtain an arrest warrant based on probable cause. Instead, she instructed Pitt officers to invade the privacy of Plaintiff's dormitory room, take him in custody and deliver him to her at Oakland Station, where she shackled him to a chair. These actions were in express violation of Plaintiff's Fourth and Fourteenth Amendment right to privacy, a right that under the U.S. Constitution can be violated only when the government has probable cause to seize a person and deprive him of his liberty.

**8. To satisfy the requirements of the Fourth Amendment, a *neutral judicial officer* must find the warrant application is supported by probable cause.**

---

[4] An "issuing authority is defined as "any public official having the power and authority of a magistrate, an arraignment court magistrate, or a Magisterial District Judge." Pa. R.J.C.P. 120.

The Pennsylvania Supreme Court has recognized that to conform to the Fourth Amendment and to Pennsylvania law, an arrest warrant must be supported by probable cause, and probable cause must be determined by a neutral magistrate officer who is independent from law enforcement:

> The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those *inferences be drawn by a neutral and detached magistrate* instead of being judged by the officer engaged in the often-competitive enterprise of ferreting out crime. [Failure to obtain] a magistrate's disinterested determination to issue a search warrant… would reduce the [Fourth] Amendment to a nullity and leave the people's homes secure only in the discretion of police officers.

*Commonwealth v. Romero, supra* at 98, quoting *Johnson* at 369 (emphasis added).

The teaching of *Johnson* is that a judicial officer's determination of probable cause has greater reliability than the unexamined account of a police officer who is immersed in a criminal investigation. See also *Shadwick v. City of Tampa*, 92 S.Ct. 2119, 2123 (1972). The judicial officer has more time to reflect on the reliability of the evidence, the trustworthiness of its source, whether the evidence is still fresh, and whether there are mitigating exculpatory factors. Needless to say, the judicial officer's training in the finer points of Fourth Amendment case law may also contribute to a keener understanding of what constitutes probable cause.

Without independent judicial review, a police officer could arrest a person or execute a search with impunity, thus violating precepts of Fourth Amendment that are fundamental to our constitutional history and traditions. As summarized by the U.S. Supreme Court:

> The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating these often opposing interests [of citizens and law enforcement]. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice.

*Brinegar v. U.S.*, 69 S.Ct. 1302, 1311 (1949)

19

**9. A magistrate's independent finding of probable cause benefits judicial economy.**

The more firmly a search or arrest warrant is based on probable cause, the less likely the warrant will be challenged in subsequent proceedings that could unnecessarily complicate and delay prosecution of the case. Likewise, at a probable cause hearing a judicial officer will become familiar with the overall circumstances of the arrest. In the instant case, for example, the judicial officer could have asked Defendant Dixon if she had contacted Plaintiff's counsel to see if V. R. would surrender voluntarily, which he would have done.

Also, had Defendant Dixon applied for an arrest warrant, it is likely the judge would have become aware it would be executed in a dormitory room. The judicial officer could have instructed Defendant Dixon to alert the Pitt officers to the special precautions that must be taken when executing a warrant in a person's domicile. Either of these precautions could have entirely avoided the public arrest, the ensuing spectacle, the deprivation of Plaintiff's liberty from October 21 to October 25, 2021, and Plaintiff's need to seek redress for the clear and indisputably unconstitutional violations of his privacy that are detailed in his Complaint.

## III.    QUALIFIED IMMUNITY – COUNTS 1, 2 AND 3

**Defendants Dixon and O'Connor are not entitled to qualified immunity.**

**1. The constitutional issue at stake in the instant case.**

The overarching right Plaintiff claims in Counts 1, 2 and 3 of the instant case is his constitutionally protected right of personal privacy.

Decisions by the U.S. Supreme Court have established a constitutional right of personal privacy. Beginning in 1968 with *Griswold v. Connecticut*, 85 S.Ct. 1678 (1965)*,* the Court has recognized a right to privacy as emanating from the Fourth Amendment and Due Process Clause of the Fourteenth Amendment. *Griswold* was only the first in a line of high court decisions that

over the last half-century have systematically expanded the contours of those amendments, affirming that they provide the basis of a federally protected right of personal privacy.

2. **Qualified immunity analysis: The two-prong test in *Saucier,* and as modified in *Pearson v. Callahan.***

In *Saucier v. Katz*, 121 S.Ct. 2151 (2001), the U.S. Supreme Court set forth a two-prong analysis for federal courts to follow when deciding if a defendant is entitled to qualified immunity against a § 1983 claim.

Under the *Saucier* formulation, the first step is for the court to determine "whether a constitutional right would have been violated on the facts alleged" in the complaint. *Id.* at 2155.

If the court so finds, the "next, sequential step" is to address the second prong, which contains a two-part inquiry. The first part is "whether the right was clearly established" at the time of the conduct; the second part brings the court to "[t]he relevant, dispositive inquiry": "whether it would be clear to a reasonable officer that the conduct was unlawful in the situation he confronted." *Id* at 2153 (citations omitted). For example, "[a]n officer might correctly perceive all of the relevant facts, but have a mistaken understanding as to whether a particular [act] is legal in those circumstances." *Id.* The qualified immunity analysis is fact-driven and takes into consideration the overall context of the particular case.

In *Pearson v. Callahan*, 129 S.Ct. 808, 818-22 (2009), the court somewhat modified *Saucier* by holding that the court may resolve the qualified immunity inquiry by approaching it from either end. That is, it may follow the *Saucier* formula and first determine whether a constitutional right existed, and if so, whether that right was violated; or it may go straight to whether any similar right was clearly established at the time, and whether a "reasonable officer" would have been aware of it. If the right wasn't clearly established, or the officer couldn't reasonably be expected to be aware of it, qualified immunity is granted and the case is over.

**3.  Qualified immunity in *O'Neill v. Kerrigan*.**

In Count 1 of the instant matter, Plaintiff claims a constitutionally protected right of personal privacy in his juvenile records. This claim is similar to the § 1983 claim in the aforementioned case of *O'Neill v. Kerrigan*, 2013 WL 655409 (E.D. Pa. 2013)*,* where the plaintiff asserted that police violated his constitutional rights when they effectively disclosed his juvenile record by arresting him on campus in plain view of students and school officials.

In this case, Plaintiff has set forth specific facts demonstrating that his public arrest in his dormitory, like O'Neill's arrest at his high school, effectively disclosed confidential juvenile records.  That fact is indisputable.  The legal question is whether Plaintiff had a right of privacy within the contours of the Fourth and Fourteenth Amendments that rendered disclosure of his juvenile records a violation of his civil rights.

In *O'Neill,* the court faced almost precisely the same question.  In resolving the case, the court followed a hybrid approach that combined elements of *Saucier* and *Pearson*.[5]

After a lengthy and closely reasoned discussion of whether O'Neill had a federally protected right of privacy in his juvenile records, the court concluded that under existing case law it could not answer that question definitively.  The court then pointed to the fact that no higher federal court or Pennsylvania court of appeals had ever found such a right.

Having reached an analytical dead-end, and despite its clear sympathy for O'Neill's argument, the court summarily concluded its opinion by declaring that at the time of the plaintiff's arrest, neither the Supreme Court nor the Third Circuit had held that juvenile records enjoyed a

---

[5] It is noteworthy that O'Neill was arrested pursuant to a valid warrant, whereas Defendants in the instant case arrested V. R. without a warrant.  As explained above (pp. 5-6), this difference makes *O'Neill* inapposite to Plaintiff's claims in Counts 2 and 3 of his Complaint.

right of privacy under the federal constitution.  Therefore, the court reasoned, defendants could not have violated a clearly established right.  The court thus granted defendants qualified immunity, and dismissed the case.

Nothing in the law barred the *O'Neill* court from finding that juveniles have a federally protected right of privacy in their records.  That is, neither the U.S. Supreme Court nor the 3rd Circuit have ever held that such a right is constitutionally unavailable or forbidden.

The *O'Neill* court declined to break new ground in finding such a right.  As noted earlier (pp. 9-10),  however, at least two federal district courts have gone in the opposite direction, denying immunity in cases where defendants recklessly or maliciously disclosed juvenile records, thus violating what the courts found to be a federally protected right of personal privacy.

**4.  As applied to Counts 2 and 3 regarding Plaintiff's warrantless arrest, a finding of qualified immunity cannot be sustained under the two-part *Saucier-Pearson* analysis.**

Plaintiff has satisfied the first prong of a qualified immunity analysis by setting forth facts in his Complaint (¶¶66-109) and in this pleading alleging that prior to taking him into custody, Defendant Dixon, acting under the supervision of Defendant O'Connor, did not obtain or possibly did not even seek even seek a warrant for Plaintiff's arrest.  Plaintiff has alleged that Defendant' Dixon's failure to obtain a warrant based on probable cause as found by a neutral judicial officer violated his rights under the Fourth Amendment as well as sections of the Pa. Rules of Juvenile Court Procedure pertaining to arrest.

**5.  The right of personal privacy that Plaintiff claims was clearly established at the time of his arrest.**

In regard to the first query in the second prong of the *Saucier* test, the Plaintiff's right to be secure in one's domicile against unreasonable searches and seizures has been a fixture of American constitutional law since the Bill of Rights went into effect in 1791.  Protections set out

in the Bill of Rights were buttressed by enactment in 1868 of the Fourteenth Amendment, where the Due Process Clause further affirmed those rights both procedurally and substantively. As noted above (p. 12), courts have uniformly held that absent exigent circumstances, a warrantless seizure in one's domicile is presumptively a violation of the Fourth Amendment's prohibition against unreasonable searches and seizures.

6. **In regard to the "reasonable officer" test in the second prong of the *Saucier* test, it would be clear to a reasonable and properly trained officer that, lacking exigent circumstances, a warrantless arrest of Plaintiff would be unlawful.**

Police officers are on the very front end of a criminal prosecution, involved principally in arresting defendants, conducting searches and interviewing witnesses in order to form a case to be pursued by prosecutors. It would be difficult to imagine any aspect of American law more fundamental to a police officer's work than the need to conform law enforcement procedures to restrictions imposed by the U.S. Constitution.

The Fourth Amendment has long been enshrined as a pillar of American constitutional law. It is a common component of civics classes in schools across the nation. Its protections, like *Miranda* warnings, are known to virtually every high school graduate, every watcher of NYPD and similar police shows, and to many immigrants who have had to pass a test to become an American citizen. In short, it is unthinkable that any officer in a properly trained police department would believe, absent exigent circumstances, that a warrantless seizure of a person in the person's domicile would be lawful. As the high court noted in *Ashcroft v. al-Kidd, 131 S.Ct. 2074, 2083 (2011),* quoting *Anderson v. Creighton,* 107 S.Ct. 3034, 3039 (1987):

> A Government official's conduct violates clearly established law when, at the time of the challenged conduct, "[t]he contours of [a] right [are] sufficiently clear" that every "reasonable official would [have understood] that what he is doing violates that right."

The doctrine of qualified immunity is founded on the idea that police officers deserve some protection for an honest but mistaken understanding of unsettled law.  But the doctrine cannot be used to excuse a public official for ignorance of a long-standing law that is part of the national consciousness.  As Justice Scalia wrote in *Ashcroft*:

> Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions, and when properly applied, it protects all but the plainly incompetent or those who knowingly violate the law.

*Id. at 2085.*

Moreover, in recent years a specific aspect of Fourth Amendment jurisprudence - the right to personal privacy - has been in the forefront of national dialogue.  It is inconceivable that a well-supervised police department would not have trained its officers on laws pertaining to such basic procedures as how to make a legal arrest, in particular the arrest of a juvenile.

**7.  Defendants Dixon and O'Connor are not entitled to qualified immunity.**

Plaintiff has alleged facts showing he was arrested without a warrant, and at the time of his arrest he had a right of privacy against a warrantless and therefore unreasonable seizure of his person in his domicile.  That right was clearly established at the time of the conduct.  Any police officer whose job requires general familiarity with criminal procedure, in particular the requirements of the Fourth Amendment, cannot reasonably claim to be ignorant of these criminal procedures and the constitutional principles they are based on.

For these and other reasons detailed in the Complaint and in this Response, Plaintiff respectfully submits that Defendant Dixon and her superior Defendant O'Connor are not entitled to qualified immunity.

## IV.    *MONELL* LIABILITY – COUNTS 1, 2 and 3

**If Defendants Dixon and O'Connor are denied qualified immunity, Defendant Bethel Park Police is liable under *Monell.***

In Count 3 Plaintiff asserts a claim against the Bethel Park Police Department pursuant to *Monell v. Dept. of Social Services*, 98 S.Ct. 2018 (1978).

*Monell* established criteria for evaluating whether a municipality may be held liable when a defendant officer of the municipality is denied qualified immunity, and thus is personally liable in a § 1983 claim for violation of a plaintiff's constitutional right. The theory underlying *Monell* liability is that the municipality, or a municipal "policymaker" such as a chief of police, may be held responsible for its failure to train or adequately supervise its officer in the observance of constitutional rights that were clearly established at the time of the officer's conduct. See *Canton v. Harris*, 109 S.Ct. 1197, 1205 (1989).

Defendants do not mention qualified immunity at all in their motion to dismiss, and scarcely mention it in their Brief. Nowhere in either pleading do they mention *Monell* liability. Nevertheless, Plaintiff is pressing a claim under *Monell*, and the issue will have to be addressed if the court finds that Defendants Dixon and O'Connor are not shielded by qualified immunity.

Of all the unique legal questions posed by civil rights litigation, numerous courts have acknowledged that perhaps the two most elusive concepts in § 1983 jurisprudence are qualified immunity and *Monell* liability. Both claims – as here - are often pleaded together. The parties in this matter are fortunate that this court is exceptionally knowledgeable in both of these two difficult areas of law.

Of course a predicate to *Monell* liability is a judicial determination that a defendant is not entitled to qualified immunity. Until that judgment is made, an extended treatment of *Monell* liability is premature. Moreover, in the discovery phase of this litigation Plaintiff will gather additional facts that will (a) help determine which theory of *Monell* liability best fits this matter,

and (b) further establish direct causality between Defendant Bethel Park Police's failure to properly train or supervise its officers and the constitutional violations Plaintiff suffered.

Meanwhile, in the Factual Allegations (¶¶19-52) and in Count 3 of his Complaint, Plaintiff has set out currently known and verified facts to make a plausible claim for relief under *Monell* if qualified immunity is denied to Defendants Dixon and O'Connor.

## V.   FALSE LIGHT-INVASION OF PRIVACY – COUNT 4

### A. Defendants wrongly contend that the image they created of Plaintiff as a criminal was true, not false, since indeed he is a criminal.

In Count 4, Plaintiff asserts that by arranging for his very public arrest, Defendants unnecessarily cast him in a false light, creating the impression that he was a criminal, perhaps a serious criminal on the run. Plaintiff further claims that in doing so, Defendants acted with reckless disregard of the injury Plaintiff would suffer as a result of this misrepresentation. Likewise, Plaintiff alleges that Defendant Dixon, under the supervision of Defendant O'Connor, was recklessly indifferent to the high probability that the university would perceive Plaintiff as a criminal and a liability to the school, and therefore suspend him. Defendant Dixon also showed reckless disregard of the fact that word of the V. R.'s apparent criminality would spread rapidly throughout his dormitory and beyond to the university student body and local community.

Defendants contend that Plaintiff's false light claim is logically impossible. They do not take issue with Plaintiff's assertion (¶125 of the Complaint) that his public arrest cast him "in the false light of a criminal" (Defendants' brief at p. 17). But they note that on January 18, 2022, three months after his arrest, Plaintiff pleaded guilty to 18 Pa. C.S. § 3126(a)(7) (sexual assault of a person less than 13 years old), a first-degree misdemeanor under § 3126(b)(iii). Therefore, Defendants say, his public arrest "did not provide false information." There was no false information because in entering his plea Plaintiff became a criminal – that is, he became the exact

equivalent of the image of V. R. that Defendants broadcast to the public.  Thus, Defendants argue, there is a perfect correspondence between the Defendants' portrayal of Plaintiff as a criminal and the reality of his situation.  Therefore, the light in which Defendants cast Plaintiff was not false, but true.

1. **The notion of "truth," as presented by Defendants, is not a defense to false light-invasion of privacy.**

Truth is a classic defense to defamation.  There are various affirmative defenses to false light.  Among them is that the portrayal of the plaintiff is parody, or the subject matter of the portrayal is in the public interest, or the person put in a false light is a public official who enjoys less protection from public scrutiny.  But "truth," as asserted by Defendants, is not a defense.

2. **A juvenile adjudicated delinquent is not a criminal under Pennsylvania law.**

Plaintiff entered a plea to 18 Pa. C.S. § 3126(a)(7) in juvenile court and was adjudicated delinquent.  Under Pennsylvania law, a delinquency adjudication is not a criminal conviction, and a juvenile adjudicated delinquent cannot legally be called a criminal.  42 Pa. C.S. § 6354(a).  *See McKeiver v. PA*., 91 S.Ct. 1976, 1989 (White, J., concurring) (noting with approval "the state legislative judgment not to stigmatize the juvenile delinquent by branding him a criminal…"

3. **The question of false light is one of reasonableness.**

Setting aside that Plaintiff is not a criminal under Pennsylvania law, Defendants' assertion that Plaintiff may be correctly characterized as a criminal is also substantively untrue.

Plaintiff concedes there may be circumstances where the gap between the public portrayal of a person and that person's actual status before the law or in society may be so slight that a false light claim cannot stand.

Consider two hypothetical situations, both purposefully exaggerated.

In one instance, a team of law enforcement officers publicly arrests a person for investigation of a barroom shooting. The manner of the arrest conveys to the public it is imperative the person be taken into custody immediately. The public subsequently learns that before the arrest police were aware the person had a record of resisting arrest as well as multiple convictions for violent crimes.

In the second, police arrest a person for a misdemeanor leash-law violation. Police were aware the person had no record of offenses. The arrest takes place in the same manner as the first - in public, by several officers, the person handcuffed and marched off to a police car, etc.

In the first situation there is a close correspondence between the portrayal and the reality of the defendant's situation. In the second, there is a wide discrepancy between the two. In a false light claim, that discrepancy matters.

So it is with Plaintiff. V. R. has an otherwise unblemished record as a citizen. He also pleaded guilty to a serious misdemeanor.

Again setting aside the legal fact that a juvenile cannot be adjudicated a "criminal," the question here is: How closely does (a) the light in which V. R. was cast – that of a criminal - correspond with (b) the accuracy of that portrayal?

This is the essential question that ultimately must be answered by the finder of fact, using the "reasonable person" standard posited in § 652E ("False Light") of the Restatement of Torts (Second) (Amer. Law Inst. 1965). But Defendants' attempt to pluck "truth" from defamation law and deploy it as a stand-alone, absolute, automatic defense to a false light claim, cannot be sustained by logic or by case law.

**B. In V. R.'s case, there is only the faintest connection between the image Defendants created of Plaintiff and his "real character, history, activities or beliefs."**

**1. The false light: V.R. is a criminal.**

The events narrated below are set forth in ¶¶18-44 of the Complaint.

On the afternoon of Thursday, October 21, 2021, Plaintiff was in the privacy of his dormitory room speaking with a fellow student when there was a knock at the door. He answered. In the corridor stood three uniformed University of Pittsburgh police officers. An officer asked if either of the two students was V. R. Plaintiff responded that he was, whereupon he was directed to step out of the room into the corridor.

As witnessed by V. R.'s friend and by others, upon arriving in the corridor an officer immediately grabbed V. R.'s hand and placed him in handcuffs. An officer asked Plaintiff if he knew "what this about." Being well aware of his wrongful conduct with the young girl, he responded affirmatively.

V. R. was then escorted down the corridor to an elevator. When the elevator arrived, Plaintiff was taken to the ground floor and, in plain view of anyone in the dormitory lobby at that time, escorted out of the building to a plainly marked police car. There, as in TV crime shows, an officer pushed his head down and placed him in the rear seat of the car.

The trip to the university police station passed along Fifth Avenue in Oakland, PA, a four-lane commercial thoroughfare with abundant pedestrian traffic. Plaintiff made eye contact with several people he knew, who observed Plaintiff in the rear seat of a police car.

Any reasonable person who saw or had knowledge of Plaintiff's arrest would conclude he had been taken into custody for a serious crime. A dormitory resident could reasonably conclude that a fugitive from justice may have been living in their midst. In short, the arrest created an impression that would lead a reasonable person to believe there was probable cause to arrest Plaintiff (even though in fact officers had no arrest warrant based on probable cause), and that taking him into custody was an urgent necessity. Moreover, a reasonable person would note that

no fewer than three police officers were required to accomplish this task, perhaps because they had information that V. R. would be violent or try to flee.

The same day, Defendant Dixon further fleshed out the portrait of Plaintiff as a criminal when, in violation of three court rules and one statute,[6] she unlawfully contacted officials at the University of Pittsburgh to inform them of Plaintiff's arrest and the nature of the charges against him.  This gratuitously proffered information further spread the false light in which Defendant's Dixon's actions placed Plaintiff.  As a result, the university officials concluded V. R. was a danger to the community and had to be removed immediately.   The university summarily declared Plaintiff *persona non grata*, gave him 24 hours to vacate his dorm room, and said he would be "arrested immediately" if he set foot on campus.

The portrait of Plaintiff as a criminal – a portrait that Defendant Dixon's conduct conveyed to the university community - was further compounded when dormitory residents witnessed him involuntarily cleaning out and vacating his dorm room well before the end of the term.  This highly unusual activity, combined with knowledge of his earlier arrest, would lead any reasonable person to conclude that V. R. was suspected of, or guilty of, serious criminal activity.

As stated in Count 4, the result of Plaintiff's public arrest and sudden banishment from campus was unquestionably to place him in the false light of a criminal.

## 2.  The reality.

The reality of Plaintiff's situation tells a far different story.

V. R., now 18, is the son of law-abiding parents who reside in Bethel Park, PA.  In 2021 he graduated from Bethel Park High School with the highest category of academic honors accorded by the school.  He was a member of the National Honor Society, a four-year varsity letterman in

---

[6] P. R.J.C.P. 160(C), 163(A) and 163(B)(1)(c), and 42 Pa. C.S. § 6308(a) and (b).

wrestling, and captain of the wrestling team his senior year. Three months after his arrest he was permitted by his probation officer and school officials to resume his studies at the University of Pittsburgh. He is currently a student in good standing at the university, where he will complete his sophomore year this spring.

In May 2021 V. R. broke the law when he wrongfully touched a young girl. Other than this violation, for which he was adjudicated delinquent, Plaintiff has no record whatsoever of any offenses. Plaintiff also has a flawless record of reporting to this probation officer, and will conclude his probation in April 2023. Eventually, Plaintiff will initiate an action to expunge this offense from his record.

### 3. The gap between false light and reality.

V. R. committed a serious offense, one that he deeply regrets. That said, it is clear there is a vast gap between the way reasonable people in our society conceive of a "criminal" and the reality of V. R.'s record as a person, a student and a citizen.

### C. <u>In Count 4, Plaintiff has pleaded sufficient facts to satisfy the elements of a false light claim.</u>

As noted by Defendants, the two essential elements of a false light claim are that (1) the false light in which plaintiff was placed would be "highly offensive to a reasonable person," and (2) the defendant acted with knowledge or reckless disregard of the false light in which the plaintiff would be placed.[7]  Restatement, § 652E.[8]

---

[7] Plaintiff submits that his public arrest and abrupt removal from campus, facts known to numerous people in the university and local community, are sufficient to satisfy the "publicity" requirement of § 652E.

[8] Pennsylvania has adopted the Restatement's definition of false light in § 652E.

The "highly offensive" standard is met when "there is *such a major misrepresentation of [plaintiff's] character, history, activities or beliefs* that serious offense may reasonably be expected to be taken by a reasonable man in his position." § 652E, Comment A (emphasis added).

It is unarguable that being portrayed as a criminal, escorted down a dormitory corridor in handcuffs and driven away in a marked police vehicle, along with Defendants' other actions as described above, would be "highly offensive to a reasonable person."  Plaintiff is a reasonable person, and he was profoundly troubled by his public arrest and portrayal as a criminal.  Other reasonable people in the community would also find that portrayal of him as highly offensive.  Any reasonable person need only to imagine being arrested in a similar manner to be outraged by the extreme misrepresentation of one's character to other members of the community.

Plaintiff's public arrest passes the "outrage" test posited in *Strickland v. University of Scranton*, 700 A.2d 979, 987 (Super. Ct. Pa. 1997) ("Generally, the case [in which liability is found] is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous.'")  See also *Terry v. Ohio,* 88 S.Ct. 1868, 1877 (1968) regarding the "significant intrusion upon dignity and privacy interests" one suffers in a public arrest and pat down.  Pennsylvania court decisions too numerous to cite here have offered definitions of "highly offensive" tortious conduct (e.g.,   where plaintiff "aver[s] sufficient facts to establish that the information disclosed would have caused mental suffering, shame or humiliation to a person of ordinary sensibilities").  *Boring v. Google*, 362 F.Appx. 273, 279 (3d Cir. 2010), citing *Pro Golf Mfg., Inc. v. Tribune Review Newspaper Co.,* 570 Pa. 242, 247 (2002).

It is likewise unarguable that Defendant Dixon, acting under the supervision of Defendant O'Connor, knew, or should have known as a trained police officer with access to information about

V. R., that Plaintiff's public arrest would create "a major misrepresentation of Plaintiff's character, history, activities or beliefs."

Plaintiff further asserts that Defendant Dixon, acting as a representative of the Bethel Park Police Department supervised by Defendant O'Connor, showed reckless disregard for Plaintiff in unlawfully contacting university officials to tell them of Plaintiff's arrest and the nature of the charges against him. As a direct result of her unlawful contact, the university formed an opinion of V. R. as a possible criminal and thus moved immediately to abruptly interrupt Plaintiff's studies and remove him from campus.

Defendant Dixon knew, or should have known, that a public arrest would cause any reasonable person to suspect that Plaintiff was being investigated for serious criminal activity. Her disregard for the highly injurious consequences she knew V. R. would suffer from his public arrest parallels her reckless disregard for Plaintiff's constitutional rights in having him arrested without a warrant, in clear violation of the Fourth Amendment.

**D.  Whether Plaintiff was cast in a false light is ultimately a question for the jury.**

False light and defamation claims are similar in that both are intensely fact driven. For this reason, once the court reviews a plaintiff's claim pursuant to Fed. R. Civ. P. 12(b)(6) and determines it is plausible, it is generally held that to further scrutinize these claims is inappropriate at the motion to dismiss stage. Therefore, questions in false light cases such as whether defendant acted with reckless disregard, or whether the light in which plaintiff was placed would be "highly offensive to a reasonable person," are ultimately questions for the jury. See *Martin v. Municipal Publishers*, 511 F.Supp. 255, 260 (E.D. Pa. 1980) (citations omitted) (once a plaintiff has presented sufficient evidence to support a plausible claim that defendant acted with reckless disregard, "the matter must go to the jury for it to find the facts and make its own characterization."). See also

*Graboff v. Colleran Law*, 744 Fed. 128, 136 (3rd Cir. 2014) *(*once the court determines that a statement could be defamatory, it is up to the jury to decide "whether the recipient actually understood the statement to be defamatory.")  The court also may wish to await further discovery before ruling on the motion.   ("[T]here has been no discovery to develop the factual record, and therefore, we decline to make these fact-intense determinations at this time." *Ciolli v. Iravani*, 651 F.Supp.2d 356, 377 (E.D. Pa. 2009).

## CONCLUSION

In Counts 1 through 4 Plaintiff has stated plausible claims upon which relief can be granted.  For the foregoing reasons, Plaintiff respectfully requests that Defendants' motion to dismiss any of the counts of the Complaint be denied, and further requests that qualified immunity be denied to Defendants Dixon and O'Connor.

Respectfully submitted,

**KOLMAN LAW, P.C.**
*/s/ Timothy M. Kolman*
Timothy M. Kolman, Esquire

## CERTIFICATE OF SERVICE

I, Timothy M. Kolman, Esquire, hereby certify that on this 1st day of March, 2023, I caused a true and correct copy of *Plaintiff's Response In Opposition To Defendants' Motion To Dismiss* to be served upon all Counsel of Record via the Court's ECF/CM system.

Respectfully submitted,

**KOLMAN LAW, P.C.**

*/s/ Timothy M. Kolman*
Timothy M. Kolman, Esquire
414 Hulmeville Ave
Penndel, PA 19047
(215) 750-3134
*Attorneys for Plaintiff*

Dated: 03/01/2023

# EXHIBIT

# A



COURT OF COMMON PLEAS OF ALLEGHENY COUNTY
FIFTH JUDICIAL DISTRICT OF PENNSYLVANIA
FAMILY DIVISION - JUVENILE SECTION
550 FIFTH AVENUE
PITTSBURGH, PENNSYLVANIA 15219
(412) 350-0200



Anniversary
1933 - 2018

The First
"Problem Solving Court"

Kim D. Eaton
Administrative Judge

Russell Carlino
Administrator/Chief
Probation Officer

**Probation Offices**

**Central Probation**
5750 Baum Boulevard
2nd Floor
Pittsburgh, PA 15206
(412) 441-9000
Fax (412)

**Eastern Probation**
907 West Street
Penn West Building
Wilkinsburg, PA 15221
(412) 241-1842
Fax (412) 242-7324

**Intake/Investigations**
550 Fifth Avenue
Pittsburgh, PA 15219
(412) 350-0170
Fax (412) 350-0130

**Mon-Yough Probation**
1195 Jacks Run Road
North Versailles, PA 15137
(412) 350-7848
Fax (412) 229-8688

**Northern Probation**
429 East Ohio Street
Pittsburgh, PA 15212
(412) 321-0165
Fax (412) 321-0181

**School-Based Probation**
3700 South Water Street
Suite 210
Pittsburgh, PA 15203
(412) 350-1203
Fax (412) 251-0064

**Shuman Intake**
7150 Highland Drive
Pittsburgh, PA 15206
(412) 665-4104
Fax (412) 363-7654

**Southern Probation**
3700 South Water Street
Suite 210
Pittsburgh, PA 15203
(412) 350-1203
Fax (412) 652-9903

To the Parents/Guardians of



Today's Date: 10/21/2021

Dear Parent/Guardian:

Please be advised that Allegheny County Juvenile Court has received a police report from the BETHEL PARK BORO police charging ▮▮▮▮▮▮▮▮▮▮▮▮ with the crime(s) listed below:

AGGRAV INDEC ASSLT/PERSON LESS 13 YRS AGE
AGGRAV INDEC ASSLT-W/O CONSENT (VICTIM <13 YRS)
AGGRAV INDEC ASSLT-W/O CONSENT
AGGRAV INDEC ASSLT/PERSON LESS 13 YRS AGE

An Intake Officer will contact you to discuss this matter further.